Good morning, your honors. Craig DeReeke on behalf of the petitioners. Could you speak up just a bit? Yes, certainly. I'd be glad to. This is not a simple case. It is a very unique case with some unusual circumstances. The issue before this court is measuring and trying to blend reality with certain legal principles. And this weekend I came across a line by Stephen Hawkins, the physicist, who said that the greatest enemy of knowledge is not ignorance, it's the appearance of knowledge. And it seems appropriate for this particular case and situation. We have a situation where the EPA issued a final rule in December of 2001. And based upon its review of all the facts and the circumstances and its interpretations of its own regulations, it decided in its wisdom that it was appropriate, and I should add based upon the advice of the USDA, the scientific community at that point, the Agricultural Air Quality Task Force, which is an entity created by Congress to advise EPA in connection with dealing with air issues relating to the agricultural industry, that there simply was not sufficient scientific data yet developed to be able to meaningfully and intelligently apply regulations, Title V regulations, emission data, for agricultural activities in most every circumstance. It issued that rule, recognizing the existence of this lack of scientific data, recognizing and knowing the existence of 42.310E in California, and deciding that three years was a reasonable amount of time for the EPA to work with the industry and with the scientific community to come up with the data and the testing procedures so that it could intelligently and reasonably develop the measuring tools so that the farmers in the state of California, most of which are very small, family-owned farms, small businesses, not an industry in the way that we usually use that term, so that they would have the tools to be able to determine whether or not they were subject to the permitting requirements, whether or not any of their activities were in fact major sources and compliant with the law in making their permit applications, paying their fees, and avoiding any liabilities that flow from those acts. When the agency decided that it had acted illegally in its own decision, interpreting its own regulations, and that it did not have the authority to defer for three years, it then decided to promulgate new rules. Well, it had to, didn't it? That is a very good question. If one assumes that EPA did not have the authority to defer, and for purposes of this argument today, we can make that assumption, but if it did have to, then it now must adopt and go through that process in a legally defensible manner. And it may not reverse its position unless it articulates sound reasons for doing so. Well, it had been told by the statute, hadn't it, that it couldn't exempt an entire industry? No. Let me see if I can frame it this way, Your Honor. When it was challenged by certain environmental associations in deciding that it could not, in the challenge stating that it did not have the authority to grant deferral to agricultural for three years, it then went behind closed doors. And without the benefit of the involvement and the comments of the interested and affected communities in which we're going to be subject to this rule, it entered into a settlement agreement. And coming out of that settlement agreement, then went through what we suggest is a sham of a rulemaking process to go through in dealing with and applying the new regulations to agriculture. In doing so, it violated several principles. In that the discretion that an agency is granted is not without limitations. The discretion to define regulatory terminology doesn't allow an agency to ignore the relevant considerations and the facts and circumstances that impact those decisions. Could the administrator have exempted the poultry industry or family farms by an acceptable definition or some subcomponent of the agricultural industry if the administrator, if she had chosen to do so? If she had chosen to grant a deferral, not an exemption. I believe that they could have, Your Honor. In fact, they have done so in the past. At this particular point, though, and they did it in the 2001 rule. They've done it in another context in the Clean Water Act. In this case, they decided to reverse that position, to do an about face. In making that decision to do that, it needs to justify those reasons, taking into consideration all the facts and the circumstances, and to fashion a remedy that deals with the reality and the situations that are presented under these facts and circumstances. The focus of the review is not on the wisdom of the agency's decision, but on whether the agency took into consideration those relevant facts and circumstances. And the deference that this court should show to an agency is far less when it reverses a position without justification than if it has held a consistent position throughout. Now, there is a fundamental principle that you, Judge Hawkins, actually recognize in a different context in the case of Fody v. City of Menlo Park, that a regulation, in that case it was a statute, can violate due process if it is so vague that a person of ordinary intelligence cannot reasonably ascertain what conduct is prohibited. And that is the challenge that California's farmers face with the present situation. The EPA has now said, we are going to regulate farmers under Title V. And the farming community does not dispute the fact that Title V applies to any major source, regardless of the industry. The tension in this case is that by EPA's own admission, and as confirmed by the National Academy of Sciences recently, and the other involved parties, the data to be able to determine, to allow the farmers to have the tools to go out and decide whether or not they are subject to Title V, whether or not their activities actually exceed the threshold limits so that they are required to file permits, pay fees, be subject to penalties if they're wrong, and citizenship if they're wrong. Those fundamental tools that are necessary for them to be able to determine whether or not their conduct is prohibited, or requires some conduct, do not exist. They don't have those tools, and we can't get around that. The EPA says that they're going to give guidance, that we will deal with this at some time in the future. But that is a hollow promise. Tomorrow, the permit deadline exists for diesel engines. And let me use that as an example, because one of the difficulties, and this is one of the things where EPA tends to gloss over some issues, diesel engines, candidly, are one of the easiest activities on a farm to be able to measure and determine whether or not it is subject to Title V. You can tell by the horsepower, the fuel you use, and some of the specifications on the engines. But what they overlook is, if a farmer has a diesel engine that exceeds the threshold limits, the law in Title V doesn't allow them to stop there. They are then required, once you exceed the threshold limits, under Title V, you are then required to then measure, quantify, and seek permits, and pay fees for any other activities on the farm that will contribute to emissions. And that includes fugitive emissions. That includes CAFOs. That includes the dust that ends up coming off the roads, most dirt roads that farmers have, and any of their plowing activities, or any of the dust that blows off their fields. Those are required to be included in the permits that are supposed to be issued tomorrow. And the farmers simply don't have the tools, and the EPA hasn't given them any of the tools, to be able to make those determinations. And the guidance that they gave just a few, what, two weeks ago, I believe? Or no, I'm sorry, it was less than two months ago. Or between 30 and 60 days ago, is remarkably flawed. And guidance is really an overstatement of the terms. The guidance that they've given is a few pages. And I realize this is not part of the record before this court, but most guidance for most injuries is several inches thick. And it defines the terms that are necessary for the permitting entities to be able to determine what kind of permits they need, and whether or not they're subject to the permits. This is a, before us, under a petition for review of the rule that EPA has adopted, correct? Correct. There's no district court involved. There's no fact-finding involved. It's one of those creatures of federal law where we look at the actions of an individual government agency, right? Correct. This is the Court of First Appeals. Tell us what you want us to tell EPA. What I want you to tell EPA is to go back and do it right. The system and the procedure in which they employ it. Do you want us to create a book this thick or that thick, and tell them to do that? Luckily, Your Honor, it is not your job to create the book, okay? What EPA needs to do to do this properly, and to achieve the multiple goals that are here, is to follow its own regulations. Follow its own timelines. Follow its own practice and procedures. Initially, if we go back to the process that they employed here, the first wall we run into is their interpretation of the regulation of the 90-day rule, okay? And as you recall in the briefs, the first step is for the EPA to issue a notice of deficiency. In this particular case, the deficiency that they relied on in saying that California was not enforcing and administering the plan, which by the way, if I may drop a footnote, is also an interesting question, because California was enforcing and administering the plan that EPA had approved in December 2001. Does EPA have to go back and find out whether or not the agricultural equipment that's being used is a major source of pollution? Or do you concede that? The EPA, we're going to run into the same problem, potentially run into the same problem downstream, but there is a remedy available to EPA that may be able to serve all purposes. If they follow the procedures that their own regulations require, it will allow the scientific community and the agricultural and farming community to work together to try and put together some reasonable regulations and some reasonable rules to try and apply Title V. How long would that take? Well, EPA thought it would take three years from December of 2001, okay? That process is ongoing. I can't give you a date, Your Honor. Although six years is probably more than is necessary. Hasn't the industry had six years? No, the industry has not had six years, Your Honor, because the industry, up until December of 2001, was relying on and in communications with the EPA, knew that it had an exemption, which at that point was not being challenged. How long has this California statute been on the books? It has been on the books since the 40s, Your Honor. But the point that I think you're making... How long has it been on the books since the adoption of the Act? The Act was adopted in 1990. The EPA, in discussions with the State of California, in working with the State of California, was aware of, and California conceded back in, I think, 1993, that 42310E was, in fact, an impediment to applying Title V. So they moved to repeal it? So they moved to repeal it. Okay, and within 90 days, they moved to repeal it within 90 days? What action did they take? The action they took within 90 days, there was actually a Senate Bill 700, which had been issued, and those actions are continuing. But the idea that one can repeal a law that has been on the books since the 40s and affects one of the largest industries in the State of California, within a 90-day period, is designed for failure. It is inherently unreasonable. Given an 18-month extension, is that right? In fact, they should have, Your Honor, yes. And that's one of your arguments, that you started the process, that the State started the process, but it's unrealistic to assume it would be done in 90 days, and the EPA abuses discretion by not giving them 18 months or at least a longer period of time to repeal that. Correct, up to two years, Your Honor. We believe that legislative action is necessary to remedy the deficiency. They should have given the State two years from the date of the notice of deficiency, but certainly 18 months after the 90-day period. Because the language of the statute itself indicates that a significant action is something less than a complete remedy of the alleged deficiency. And one point, if I may go back, Judge Hawkins, that you made, the reason that California did not involve the issues and try and remedy this earlier was not because of the existence of 42.310E. It was because of the lack of existence of scientific data, which was well known by EPA and the agricultural and scientific community. Everybody understood that within that three-year period of time, that 42.310E was going to be dealt with, would have to be dealt with. But that's putting, if I may use an analogy, the plow before the horse. The reason the deferral was granted was not because of 42.310E. It was the status with the scientific data. That is now the excuse, candidly, that EPA is using to try and jam the 90-day rule down. What they should have done and what we're asking this court to do, and then I'd like to reserve the remainder of my time, is to send it back, have them follow the regulations, 90 days to make significant action, if not 18 months in which to repeal 42.310E, give the community and the farming community an opportunity to come up with the tools to be able to comply with the law. Because if they're not given those tools, it is a violation of due process to try and impose it upon them. And with that, I'll reserve the remainder of my time. Thank you for your argument. You have almost four minutes. Thomas Lorenzen. Thank you, Your Honors. Thomas Lorenzen with the U.S. Department of Justice. On behalf of the respondent, the United States Environmental Protection Agency, I do want to introduce a few folks at council table. Carol Holmes from EPA's Office of General Counsel in Washington. Paul Court from EPA's Office of Regional Counsel here in San Francisco. Also, counsel for interveners, Brent Newell and Ann Harper. I do not believe that the interveners will be presenting argument unless the court has any specific questions for them. Well, we hope we won't irritate them. Nor do I hope will I. Actually, before arguing, we were wondering if any of us had ever been a member of such a group. Go ahead. Your Honors, EPA clearly erred when it approved the Title V programs that are at issue in this case. It was sued, it was persuaded of the error of its ways, and it took staffs to correct that error as quickly and with as little disruption to the state program as possible. Let me make a few points here. First, as counsel from the Farm Bureau conceded, Title V unambiguously applies to all major sources of air pollution, including all major sources in the agricultural sector. The Farm Bureau appears to admit in its reply brief that there are major sources in the sector. That does not appear to be a dispute. What they claim, as we've heard again and again, is that there's not sufficient science to allow their members to make determinations whether they need to apply for permits. There is a solution to that in EPA's regulations. 40 CFR Section 71.3E1 provides that they can submit the information that they have to EPA, and EPA will make the applicability determination for them. So, there is a route out even absent guidance. And there is guidance now. We submitted a guidance, or a 28-J letter to the court informing the court of EPA's recent guidance. EPA expects to be issuing guidance on the issue of concentrated animal feeding operations in mid-June, well before the August deadline for submitting permits for those sources. The question in this case is whether EPA should have given the state more time to revoke the agricultural exemption. Did EPA act permissibly and withdraw its prior approvals in implementing Part 71? It did. EPA's regulations permit EPA to impose sanctions, including withdrawing approval of a Title V program and implementing a federal program in its place as soon as 90 days after issuing a notice of deficiency to the state. These regulations also permit EPA to allow up to two years to make that correction, and I'm going to quote the regulation here, 70.4I1, if the state demonstrates that additional legal authority is necessary to make the program revision. Now, in that regard, it's worth noting that the state did not request any additional time from EPA. In fact, the state didn't even comment on EPA's proposal to withdraw its approval or implement the Part 71 program. The state's not even a party to this suit. Where is the state? The state remains in control of its own fate. It can cure the defect at any time by revoking Section 42.310E, and it can retake control of its Title V program. It hasn't chosen to do so. Your Honors, I'll also address the Regulatory Flexibility Act, if there is time permitting, but counsel practitioners did not address it here. Let me turn then to their primary arguments. They essentially argue that they need more time before Title V applies to sources, but the statute unambiguously sets clear deadlines here, and it does not permit for further deferral of Title V applicability. Section 502.d.1 of the Clean Air Act states that these states were to have submitted permit programs to EPA not later than November 15th of 1993, ten years ago. 502.d.1 also states that EPA was to approve or disapprove those programs in whole or in part within one year, or by 1994. 502.g of the Clean Air Act says that EPA was permitted to grant one, one two-year interim approval, which should have expired no later than 1996. So by 1996, everything should have been regulated that was a major source. Now, EPA was sued once already for extending those interim approvals past 1996. We're now seven years beyond the statutory deadline, an express statutory deadline, and we believe that further extensions of that, such as the deferral that counsel asked the court to order, would merely compound the violation of the statute's very clear command. Now, the Farm Bureau tries to avoid this clear command in two ways. They argue that EPA's interpretation of the statute is entitled to no deference because of its reversal of course and because of the lack of scientific data on agricultural emissions. Deference is not an issue here, Your Honors. This is a Chevron step one case where Congress has directly spoken to the precise question at issue, that's the end of the matter. And the case that Farm Bureau cites, Brouwer v. Evans, which is 257 F. 3rd, 1058, is a case that applies only to factual inquiries. This is a legal inquiry. Does the Clean Air Act require these sources to be subject to the Title V program, and by when were they required to be subject to it? 1996 was the latest date. Now, the Farm Bureau cites EPA's modification in its reply brief of a Clean Water Act NIFTIS permit deadline for stormwater discharges. I'm sorry, I'm using acronyms here. NIFTIS is the National Pollution Discharge Elimination System. For the proposition that EPA has extended deadlines before and therefore that it cannot argue that it has no authority to do so under the Clean Air Act. I note that that was a Clean Water Act regulation at issue. And the statute in question there, 33 U.S.C. section 1342 P6, is very different from Clean Air Act section 502. 502, as I've just recited, gives you specific dates by which steps were to be taken and by which the program was to be implemented. Clean Water Act section 1342 P6, on the other hand, merely commands that EPA establish, quote, expeditious deadlines, close quote. EPA has discretion under that statute to extend those deadlines if it thinks they're more than expeditious, too expeditious. Very different from this case where there is no discretion at all. The statute plainly required withdrawal of EPA's prior approvals and implementation of the Part 71 program because of the exemption for agricultural sources that's provided in section 42310E of the Health and Safety Code of the State of California. As I noted earlier, your honors, EPA clearly made a mistake when it approved the Title V programs, notwithstanding the agricultural exemption. EPA was sued. It took action to correct that. So did we comply with our regulations in taking those steps? That's what's at issue here. Farm Bureau argues that we erred in three respects. They argue that we should have given the state two years to remove the agricultural exemption under 40 CFR 70.4I1. They argue that EPA erred by requiring the state to remove or revise the agricultural exemption within 90 days as the significant action necessary to avoid sanction under 40 CFR section 70.10B2. And finally, they argue that EPA could not affect a partial withdrawal on a non-geographic basis under 40 CFR 70.10B2I. Now, none of these arguments withstand scrutiny, particularly under the extraordinarily deferential standard that applies to an agency's interpretation of its own regulations. Thomas Jefferson University versus Shalala, which is a Supreme Court case of 512 U.S. 504, states that an EPA's interpretation of its own regulations is entitled to controlling weight unless that interpretation is plainly erroneous or inconsistent with its regulations. Here, EPA's interpretation is entirely consistent with its regulations. So, moving to repeal the statute wasn't a significant action because EPA says it wasn't significant. There must be a deference to that. They say it's not significant. That's right. We believe... It doesn't make any difference whether they allowed 90 days, 10 days, 2 years. It makes no difference. Well, 90 days... It simply wasn't significant. 90 days is the minimum required by... Nobody can... It's hard to repeal a statute in 90 days. Well, in fact, California law does allow a state to act very quickly to repeal a statute. But in this case, the state had had 8 years. The Attorney General of the state had written a letter to EPA in 1993. They took a step. They introduced legislation to repeal the statute, and you don't consider that significant. It went nowhere. The statute is still on the books. We're now significantly down the road. We're now a year later. It's still on the books. Nothing has happened. We, to be frank, Your Honor, EPA did not expect that the state was going to repeal the statute. It has too much vested interest in having it on the books. There is too much inertia. Does EPA have to make a finding that agricultural machinery is a major source of pollution? No, it does not. In fact, that is a step that is later in the process when sources apply for permits. The only question that EPA had to determine is whether, if there are major sources in the agricultural sector, they must be subject to Title V. And the statute is clear on that. EPA lacks authority to approve a state program that doesn't cover all major sources, and EPA lacks authority to implement its own program if that program does not cover all major sources. All major sources, no matter what industry, must be covered. In fact, there is a provision in the statute that provides EPA with authority to exempt source categories, but that section has itself an exception that says that, however, EPA may not exempt any major source from regulation. So if EPA had determined that there are simply no agricultural sources that are major sources, it could exempt the sector. But I don't think that's even an issue in this case. I think that the Farm Bureau admits there are major sources in the sector, and they certainly offered nothing to this Court or to EPA to suggest that there are not. But at the permit stage, EPA can consider whether these sources are major or are area sources and thus exempt from Title V. Now, as I said earlier, Your Honors, one of the questions in this case is timing. How quickly could EPA act to impose sanctions? EPA's regulations are designed to allow EPA considerable flexibility in determining what must be done and how quickly to avoid imposition of the Federal Part 71 program. 40 CFR 70.10B2 sets the inner boundary. It says that EPA may not take action without giving the State at least 90 days to correct a deficiency. 70.10B4 and 70.4I1 set the outer boundary. They say that EPA must implement the Part 71 program if the State has not cured the defect within two years. They don't guarantee the State two years. They say that EPA must act to implement the Federal program if the State has not fixed it within two years. The petitioners ignore some very significant language in 40 CFR 70.4I1. They note the fact that that section of the regulation states that the program shall be revised within 180 days. They ignore the following clause. Or such utter period as the administrator may specify. We don't have to give them 180 days. If we don't specify a time frame under this regulation, they get 180 days. And we can specify less. And we can give them no more than two years. Now, the petitioners cite the Kentucky Notice of Deficiency as evidence that EPA is acting inconsistently. But I note that in that Kentucky Notice of Deficiency, we gave the Commonwealth of Kentucky only six months to remove the Offending Auto Privilege Law. Not two years. Not 180 days. Six months. So, again, the regulations reflect Kentucky. 180 days is six months. Never mind. Roughly. Roughly. But we required significant action earlier than that. You're right. Well, let me in that case turn to significant action. Significant action is not defined in EPA's regulations. I'm sorry. The point is we gave them less than two years. And they did contend in the brief that we should have given them two years. Because that was a case where additional legislative authority was necessary to make the program effective. And they contended where that's the case we should have given them two years. We gave them only six months in that case. So, clearly, the two years is not something that applies the way the Farm Bureau suggests. Now, significant action. Again, it's not defined in EPA's regulations. And, accordingly, EPA's interpretation of that is entitled to the highest level of deference under the Thomas Jefferson University case. That term is intentionally brought to allow EPA to consider the totality of circumstances in determining what action must be taken. Here the state of California knew for eight years that the agricultural exemption had to go. And, therefore, it was within EPA's discretion to determine that the appropriate significant action it would demand as a condition for not imposing sanctions within 90 days was revision or removal of that exemption. The notice of deficiency issued to Kentucky that is cited by the Farm Bureau, again, presents a very different situation. There only three years had elapsed since EPA first corresponded with the state regarding the offending audit privilege law. California, as I said, was on notice for eight years. The California legislature meets every single year for most of the year. In Kentucky, the General Assembly meets only for a total of 30 days during odd-numbered years, like 2001. And the notice of deficiency in that case was issued at the very end of 2000. So, giving them 90 days, they never could have accomplished anything. They weren't in session for more than 30. We turn to the argument that they make regarding partial withdrawal on a non-geographic basis. The Farm Bureau, frankly, lacks standing to make that argument. They have to show that any order this court would issue would remedy a harm they allege. Now, if EPA lacks authority to do a partial withdrawal on a non-geographic basis, the only remedy would be a full withdrawal of EPA's approval and implementation of the Part 71 program for every source in the state. Their sources would still be regulated. There would be no remedy to their harm. In any event, EPA has the authority, under its regulations, to withdraw approvals on a non-geographic basis. The Clean Air Act itself does not limit EPA to geographic partial withdrawals. Section 502I merely states that a permitting authority that is not adequately administering or enforcing a program, or portion thereof, is subject to a determination of deficiency. Again, it's not limited to a non-geographic basis. Now, EPA chose to limit its approvals of programs to partial programs that apply to all Part 70 sources within a limited geographic area. And they did that in 40 CFR 70.4C1. And the reason they did that is to encourage local agencies to develop and submit complete programs. Get your house in order, we're basically saying to these agencies, before you submit your program to us. We want to know that you can control everything. However, when things break down in an agency, it isn't necessarily necessary to withdraw approval for everything. And that's why EPA's regulations regarding withdrawals of approvals are not so limited. 40 CFR section 70.10B2I says that as soon as 90 days after finding inadequate administration or enforcement, EPA may withdraw approval of the program, or portion thereof, using procedures consistent with 70.4E. There's no reference to a geographic limitation, or to a non-geographic limitation, pardon me. This allows EPA to craft very narrowly tailored withdrawals that ensure complete administration of the Title V program with minimum disruption to the air control agency and to the regulated sources. And EPA's interpretation of its regulations is entitled to control and wait. Now, the Farm Bureau has argued that we basically reversed an established position when we basically conceded our error and changed our ways. And they said we did so without explanation. Well, I think that, in fact, EPA's rulemaking is replete with explanation. As we said in the withdrawals, EPA agrees that the agriculture industry is a unique industry and that the application of Title V for the industry poses some special challenges. Section 502A of the Clean Air Act, however, requires that a Title V permitting program apply to every major source. That's explanation. The statute required us to do it. We had no choice. In fact, what was unexplained was our departure from our various interim approvals where, you know, we'd been saying for six years you have to remove this exemption. And then suddenly in 2001 we changed course for a space of about seven months. And, in fact, the environmental groups commented and said you have no authority to do that. And we never responded to those comments. That was the unexplained departure. I have about a minute and a half left, and I'll turn very briefly to the Regulatory Flexibility Act, even though petitioners didn't address it in their oral argument. The record, Your Honor, is ______. I think you're correct. They didn't address that in their argument. I don't think it's proper to respond. In that case, Your Honor, I believe that I've addressed all the points that I need to, unless the Court has questions. I don't see any. Thank you for your honesty. Thank you so much, Your Honor. Rival? Thank you, Your Honor. And hopefully it goes without saying that the fact that I didn't touch on every single issue in our brief does not mean we're abandoning any of those arguments. I'm just going to focus on those. Thank you. EPA raises several issues which are strong in arguments. You're right. We are not disputing that the agricultural industry is subject to Title V, nor are we disputing that there may very well be and probably are some major sources in that industry. What we are discussing and what we're focusing on here is that EPA failed to follow its own rules and procedures in trying to remedy a solution to the problem that is presented to both EPA and to the farming communities. To say that, okay, forgive me. Let me withdraw and come at this from a different direction. Let's start with the process that they undertook. When they realized or they decided that they took the position that they didn't have authority to grant a deferral, there is great flexibility available to the EPA in remedying and fashioning the solution. In fact, when they take a position that is contrary to a prior position, okay, there is substantially less deference granted to that agency in making that decision. That's INS versus Cardozo-Forsenka 40 U.S. 421. The agency's discretion to define regulation terminology does not allow that agency to ignore the relevant facts and circumstances and that's the Department of Wildlife case cited in our briefs. That's 258 F. 3rd 1136. And finally, an agency may not reverse an established position unless it articulates sound reasons for doing so. That's the ASARCO case at 616 F. 2nd 1153. The argument is that, as I understand it, if I'm wrong, that an agency concluding, discovering, being forced to conclude, whatever, however you get there, that their prior position was inconsistent with the authorizing statute is not good enough. There's two pieces, Your Honor. They can sit there and say, fine, we read the regulations and say that we don't have the authority to defer. That in and of itself may be defensible. But then part of that analysis and part of what they're required to explain in the record is how they're going to deal with that. Taking into consideration the facts and circumstances, why did they choose the methodology that they employed here? Why did they decide to say that substantial or significant action must be complete repeal of 42.310E within 90 days when they know that that is a design for failure? Why did they pick such a short time frame to implement the permit requirements when they had the discretion and the authority to grant 18 months up to two years, especially when they knew that they were going to deal with a piece of legislation that was going to be highly controversial? And I disagree with counsel. There is substantial activity in Sacramento right now, and that statute is going to be repealed. When? That I can't speak to in all candor, Your Honor. How long has this been going on? This has been going on for about a year. But there is, as you would expect, a lot of activity. And the general consensus, and I realize this isn't part of the record, is that this statute is going to go down. The important point is nowhere in the regulations, nowhere in EPA's final rule is there any explanation as to why they took the course they did. Why was it necessary for them to impose this procedure? And that is required under the case law. And the reason that they don't address that, and this is a substantial deficiency, is because they were required to under a settlement agreement, an agreement that was fashioned between the EPA and certain coalitions behind closed doors where they excluded the other interested parties. And then they went through a rulemaking process, which perhaps coincidentally completely tracked each and every provision of that settlement agreement, which we contend violates the very principles of the rulemaking process, which is supposed to bring together in a meaningful dialogue and discussion all of the entities and the parties that are going to be affected by this rulemaking process. And that's why earlier, with all respect, I said it was a sham process. So these are the key issues that require... Can you wrap up your almost two minutes over your time? Oh, I do apologize. Unless you have any questions, I have nothing else, Your Honor. Okay. Thank you very much. Thank both sides for their argument. It is a complex case, and we appreciate the help. The case just argued will be submitted for decision, and the court will stand in recess for the day. Thank you. Thank you all very much. The court is in recess. The stand is adjourned. Thank you. Thank you. The stand is adjourned.
judges: Hawkins, W.fletcher, Breyer